# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| NANCY McKAY, as Guardian of | ] | |
| ARTHUR BRUCE McKAY, | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| v. | ] | CV-03-BE-0590-W |
| | ] | |
| TRACOR, INC. D/b/a TRACOR | ] | |
| SYSTEMS TECHNOLOGIES, INC., | ] | |
| a foreign corporation doing business | ] | |
| in the State of Alabama, et al., | | |
| | | |
| **Defendants.** | | |

## MEMORANDUM OPINION

### I. INTRODUCTION

This case is before the court on Plaintiff's Motion for Partial Summary Judgment[1] (doc. 47) and Defendants' Cross-Motion for Summary Judgment (doc. 59).  For the reasons set forth below, the court finds that the Motions are due to **GRANTED in part** and **DENIED in part**.

Specifically, Plaintiff's Motion for Partial Summary Judgment is **GRANTED in part** in that the government contractor defense does not apply to Count One's negligence claims; Count Three's breach of warranty claims; Count Four's negligence/wantonness claims; Count Five's negligent hiring, supervision, and training claims; and Count Six's Federal Medical Care Recovery Act claim.  Plaintiff's Motion is **DENIED in part** in that the government contractor defense does apply to Count Two's product liability claim.

Defendants' Cross-Motion for Summary Judgment based on the government contractor

---

[1]The motion was not styled as "partial."  However, by its nature this motion is partial because it is not determinative of all claims.  *See* Fed. R. Civ. P. 56(d).

defense is **GRANTED** as to Count Two's product liability claim and **DENIED** as to all remaining claims.[2]

### FACTS

Both Plaintiff and Defendants filed Motions for Summary Judgment and contend that no genuine issues of material fact exist. The parties thus agree concerning the following operative facts, unless otherwise noted.

Defendant BAE Systems consists of BAE Systems Applied Technologies, Inc.; BAE Systems North America, Inc.; BAE Systems, Inc.; and Tracor, Inc doing business as BAE Systems Integrated Defense Solutions, Inc. At the time relevant to this lawsuit, Defendant Keith St. John was an employee of BAE Systems who worked as an electronic technician and field supervisor for Camp Fuji, Japan. In 1989 the United States Government awarded BAE Systems a contract to install and maintain a series of Intrusion Detection Systems (IDS) for the United States Marine Corps. An IDS is an integration of sensors, software, and alarms that protects a secured area such as an armory or an ammunition magazine. Similar to a burglar alarm, if the IDS detects movement in or around a secured area, the system sounds an alarm and sends a signal to a command center that decides the appropriate course of action.

Ordinance Magazine 354 is an ammunition magazine located at Camp Fuji, Japan. Magazine 354 was protected by an IDS installed by BAE Systems and maintained by Keith St. John. The magazine was also protected by a motorized steel door weighing four thousand

---

[2]The court did not consider the application of the "open and obvious danger" defense referenced in Defendant's Cross-Motion for Summary Judgment. The only issue to be addressed at this stage of the litigation is the application of the government contractor defense. *See* docs. 29, p. 4; 77, p.1.

pounds.  When the motorized door is fully open, it takes approximately ninety seconds to completely close.

To secure Magazine 354, a Marine must call the Alarm Control Center (ACC) and request to close the magazine.  The ACC operator then places a "mask" on the IDS that disables the alarm and allows the Marine time to enter the magazine, arm the IDS, exit the magazine, close the door, and install an intrusion device on the outside of the door.  The mask time for Magazine 354 was set at sixty seconds, which is less than the amount of time required to close the magazine's door.  Therefore, to fully secure the magazine before the IDS activated itself and set off an alarm was impossible.

As an alternative to calling the ACC and requesting a mask, a Marine can secure Magazine 354 by turning the magazine's secure/access switch from the "access" to the "secure" position.  This switch is located inside the magazine.  Once the switch is placed in the "secure" position, the IDS arms itself after a sixty second delay.  However, because of the ninety seconds required to close Magazine 354's door, the sixty second delay time was still not sufficient to allow a Marine to place the secure/access switch to the "secure" position, exit the magazine, and close the door before the IDS activated itself and sounded an alarm.

Due to the impossibility of closing a fully-opened door and securing the magazine within either the sixty second mask time or the sixty second delay time, the Marines at Camp Fuji utilized two methods to arm the IDS.  The first method required a Marine to partially close the magazine door using a button located outside of the magazine.  The Marine would stop the door from closing by halting the door's movement approximately three feet from the closed position.  Thereafter the Marine would contact the ACC to request a mask, walk into the magazine, arm the

3

IDS, exit the magazine, and finish closing the door within the 60 second mask time.  Testimony shows that this method was the approved method for securing Magazine 354 at Camp Fuji.  The second method calls for a Marine to push the button to close the magazine door, wait approximately 30 seconds, then enter the magazine, arm the IDS, and exit the structure *all while the door is closing*.  Ideally, the Marine would be able to accomplish these actions within the 60 second default delay time built into the IDS.  Testimony on the record indicates this method was used by several Marines to secure the magazine.

PFC Arthur Bruce McKay was a United States Marine stationed at Camp Fuji, Japan.  On March 5, 2002 PFC McKay was ordered to secure Magazine 354.  PFC McKay pushed the "close" button located outside the magazine door, walked past the moving door, armed the IDS by turning the secure/access switch to "secure," and then attempted to exit the magazine.  However, he became pinned between the four-thousand-pound door and the door frame and sustained a traumatic brain injury that will require twenty-four-hour-a-day care for the rest of his life.

Plaintiff Nancy McKay filed this lawsuit on behalf of her son, PFC Arthur Bruce McKay, on March 17, 2003.  She sues the military contractors for negligence, products liability, and breach of warranty.  Plaintiff's specific causes of action against Defendant BAE Systems include negligence in Count One; products liability in Count Two; breach of warranty in Count Three; combined and concurrent negligence and/or wantonness in Count Four; negligent hiring, supervision, and training in Count Five; and a claim under the Federal Medical Care Recovery Act in Count Six.  Plaintiff's causes of action against Defendant St. John include negligence in Count One, combined negligence and/or wantonness in Count Four, and a claim under the

4

Federal Medical Care Recovery Act in Count Six.

Plaintiff filed a Motion for Partial Summary Judgment requesting that the court find that the government contractor defense does not apply to this case.  Defendants BAE Systems and St. John filed a Cross-Motion for Summary Judgment requesting that all of Plaintiff's claims be dismissed on the basis of the government contractor defense.

## II.  STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases where no genuine issues of material fact are present.  Fed. R. Civ. P. 56.  A court must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  *Id*.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The movant can meet this burden by offering evidence showing no dispute of material fact, or by showing that the nonmoving party's evidence fails to meet some element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial."  *Id*. at 324 (quoting Fed. R. Civ. P. 56(e)).  The responding party does not need to present evidence in a form admissible at trial; "however, he may not merely rest on [his]

5

pleadings." *Id*.

In reviewing the evidence submitted, "the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mutual Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). After both parties have addressed the motion for summary judgment, the court must grant the motion if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

### III.  DISCUSSION

**A.  Application of the government contractor defense to Plaintiff's claims.**

For the government contractor defense to apply, the contractor must show (1) a federal interest and (2) a conflict between the federal interest and state law warranting displacement of the state law. *Boyle v. United Tech's. Corp.*, 487 U.S. 500, 507 (1988). In *Boyle*, the Supreme Court noted that the government's procurement of military hardware qualified as an area of "uniquely federal interest." *Id*. at 506; *Harduvel v. General Dynamics Corp*., 878 F.2d 1311, 1315 (11th Cir. 1989). The Court also noted that the Federal Tort Claims Act (FTCA) demonstrated the potential for "significant conflict" between this federal interest and state law. *Boyle*, 487 U.S. at 511. The Court stated that by enacting the FTCA, Congress permitted suits against the United States for harm caused by the negligent or wrongful conduct of government employees, but excepted from consent to suit "any claim...based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be

6

abused." *Id.*, quoting 28 U.S.C. § 2680(a) (2005).

> The Court concluded that, with respect to the design of military equipment,

> the financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs.  To put the point differently: It makes little sense to insulate the government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.  In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a significant conflict with federal policy and must be displaced.

*Boyle*, 487 U.S. at 511-12.  The Court then articulated three factors to analyze when deciding whether to displace state law liability for design defects: (1) government approval of reasonably precise specifications; (2) the equipment's conformance to the specifications; and (3) the supplier's warnings to the government about the equipment's dangers that were known to the supplier and not the government.  *Id.* at 512.

The Eleventh Circuit applied the *Boyle* factors in several design defects cases. *See Gray v. Lockheed Aeronautical Sys. Co.*, 125 F.3d 1371, 1379-81 (11th Cir. 1997) (vacated on other grounds)[3] (applying the government contractor defense to a claim for defective design, but not to claims for negligence or strict liability with respect to not meeting design specifications); *Glassco v. Miller Equip. Co.*, 966 F.2d 641, 643-44 (11th Cir. 1992) (using *Boyle* factors and affirming summary judgment for defendant contractor on negligent/wanton design

---

[3]The Supreme Court vacated *Gray* on grounds unrelated to the government contractor defense, and on remand the Eleventh Circuit affirmed the remainder of the decision that did not touch the grounds on which the Supreme Court vacated.  *See Gray v. Lockheed Aeronautical Systems Co.*, 155 F.3d 1343 (1998).  Thus, the Eleventh Circuit's analysis in *Gray* remains good law as to the government contractor defense.

and manufacture claims, but not extending the *Boyle* factors to analyze a duty to warn claim);

*Dorse v. Eagle-Picher Indus.*, 898 F.2d 1487, 1488-89 (11th Cir. 1990) (affirming summary

judgment for plaintiff because the government contractor defense did not apply to a duty to warn

when nothing precluded defendant contractor from complying with contractual obligations and

its duty of care, but noting that the defense applied to shield contractors from liability related to

*design defects* in military equipment); *Harduvell v. General Dynamics Corp.*, 878 F.2d 1311,

1317 (11th Cir. 1989) (stating that the "government contractor defense is a matter of federal

common law, and so is the denomination of a defect as one of *design or manufacture* for

purposes of applying the defense" before applying *Boyle* and reversing a jury verdict for

plaintiff's products liability claims) (emphasis added).

　　　　Defendants assert, and the court agrees, that the government contractor defense does not

apply to all of Plaintiff's claims.  Based on the Eleventh Circuit precedent applying the

government contractor defense to claims for design and manufacture defects, the court

determines that this defense applies only to Count Two's products liability claim against BAE

Systems.[4]  Having determined that the government contractor defense applies to the products

liability claim, the court must next determine whether it operates to protect Defendant BAE

Systems under the facts of this case.

**B.  The application of the *Boyle* factors.**

　　　　The government contractor defense extends to a contractor the government's sovereign

immunity from liability for design defects regarding contracted-for equipment "when (1) the

_____

[4]Count Two asserts a products liability claim against BAE Systems only.  Keith St. John
was not named in Count Two.

United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Tech's. Corp.*, 487 U.S. 500, 512 (1988). "The first two conditions of the Boyle test 'assure that the design feature in question was considered by a government officer, and not merely by the contractor itself.' The third condition serves to eliminate any incentive that the military contractor defense might create for contractors to withhold knowledge of risks." *Gray v. Lockheed Aeronautical Sys.*, 125 F.3d 1371, 1377 (11th Cir. 1997) (quoting *Boyle*, 487 U.S. at 512).

### 1. The first *Boyle* factor.

The first *Boyle* condition requires (1) that the specification approved by the government be "reasonably precise"; and (2) that the government actually approved the specification.

> The requirement that the specification be precise means that the discretion over significant details and all critical design choices will be exercised by the government. If the government approved imprecise or general guidelines, then discretion over important
> design choices would be left to the government contractor.

*Gray*, 125 F.3d at 1377 (*quoting Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1481 (5th Cir. 1989)).

In this case two relevant time settings apply, both of which constitute "reasonably precise" specifications. *See Gray*, 125 F.3d at 1377. The first setting is the sixty-second mask/delay time that was pre-set in Magazine 354. The second setting is the zero to five minute time interval that provides a "window" within which the mask/delay time can be set. Undisputed evidence shows that the IDS mask and/or delay time could be set anywhere between zero and

five minutes.  The Eleventh Circuit has found that specifications designated as "minimum

figures" are sufficiently precise under the *Boyle* test.  *See Glassco v. Miller Equipment Co.*, 966

F.2d 641, 643 (11th Cir. 1992) (finding that minimum specifications related to the width and

thickness of a leather belt were sufficiently precise for the government contractor defense).

Accordingly, an interval designating both a minimum and maximum time limit (between zero

and five minutes) constitutes a "reasonably precise" specification.  *See Gray*, 125 F.3d at 1377.

The real issue is whether the sixty-second mask/delay time set by Defendants was a

government approved specification or an act of discretion by Defendants.  Although the record

indicates that the intent behind the IDS was to have the alarm tailored to specific locations, the

record fails to show (1) that the government disapproved of Magazine 354's pre-set sixty-second

mask/delay time; or (2) that the government wanted Magazine 354's time parameter changed.  On

the contrary, substantial testimony shows that SPAWAR[5] engineers approved of the sixty-second

setting based on the government's initial acceptance test when the IDS was installed at Camp

Fuji in 1993.  Additionally, the government continued to use the sixty-second setting on

Magazine 354 for at least ten years after the IDS' installation.  The long term use of a product

can establish approval of its specifications under the *Boyle* test.  *See Ramey v. Martin-Baker

Aircraft Co.*, 874 F.2d 946, 950 (4th Cir. 1989) (stating that the "length and breadth of the

[military's] experience with the [component] - and its decision to continue using it - amply

establish government approval of the design defects.")  For these reasons, the court concludes

that the government approved of the sixty-second setting for Magazine 354.

---

[5]SPAWAR (or SPAWARSYCEN) was the acronym for the Space and Naval Warfare
System Center, a division of the U.S. Government that oversaw contract operations.  It has
undergone several name changes including NAVELEX, the Charleston Shipyard, and NISE East.

## 2.  **The second *Boyle* factor.**

The second factor requires that the equipment conform to government specifications.  The

Eleventh Circuit has held that

> [t]o demonstrate the second *Boyle* condition, a contractor must show that the
> equipment at issue conformed to precise, government-approved
> specifications....To say that a product failed to conform to specifications is just
> another way of saying it was defectively manufactured....A contractor may show
> conformity through evidence that the military was present, and actively involved
> throughout the design, review, development and testing of the equipment at issue.

*Gray v. Lockheed Aeronautical Sys., Co.,* 125 F.3d 1371, 1378 (11th Cir. 1997) (vacated on other

grounds).

The evidence of record shows that SPAWAR engineers observed the mask/delay time

during the installation and testing of Magazine 354's IDS, they had the opportunity to change the

time, and they did not change the time.  Additionally, the Marines continued to use the sixty

second setting on Magazine 354 for at least ten years after it was installed.  The government's

participation in the testing, acceptance, and review of the IDS coupled with its long-term use of

the IDS after the 1993 installation shows that the equipment was accepted as conforming to

government specifications.  *See Id.*; *see also In re Air Disaster v. Lockheed Corp.*, 81 F.3d 570,

575 (5th Cir. 1996) (holding that the use of an Air Force aircraft for over twenty years coupled

with the fact that Air Force personnel were involved in the design and test of the aircraft was

sufficient to show conformance).

Plaintiff argues that the IDS did not conform to the government's specifications because

Defendants did not customize the mask/delay time based on the site's particular characteristics.

Plaintiff's submissions showed that Defendants were contractually obligated to conform each

11

IDS' mask/delay time parameters pursuant to a site survey conducted at each installation. While this evidence might apply to a breach of contract claim, it is not applicable to a design or manufacture defect claim. Defendants' contractual obligations respecting the installation and maintenance of the IDS are not the same as the government's design specifications. The document entitled "Specifications for Intrusion Detection Sensors, Security Telephone and Associated Equipment and Material at Marine Corps Sites" states that a user must be able to set a mask/delay time within a zero to five minute time period. No evidence suggests that the mask/delay time at Magazine 354 could not be set within those parameters, nor does any evidence suggest that the mask/delay time failed to operate in its sixty-second pre-set mode. The IDS, therefore, conformed to the government's design specifications.

### 3. The third *Boyle* factor.

The third factor involves warning and knowledge of any alleged dangers inherent in the equipment. "A contractor may satisfy the third *Boyle* condition through evidence that it warned the government of all the dangers known to it but not the government." *Gray*, 125 F.3d at 1379. If the contractor did not warn the government of any known danger, the contractor may still satisfy the third element by proving either (1) that the contractor lacked actual knowledge of the alleged dangers relating to the product; or (2) that the government already knew of the alleged danger. *See Boyle v. United Technologies*, 487 U.S. 500, 513 (1988); *In re Aircraft Crash Litig., Frederick, Md., May 6, 1981*, 752 F. Supp. 1326, 1327 (S.D. Oh 1990).

To show a disputed issue of fact regarding the third *Boyle* factor, Plaintiff offers the deposition testimony of a single government employee who claimed that he personally did not

know that Magazine 354's closing time exceeded the sixty second mask/delay time.[6]  However, the record conclusively shows that the government specifically knew of any potential danger related to Magazine 354's IDS.  The record contains deposition testimony confirming that (1) SPAWAR engineers observed and tested the operation of the IDS during its 1993 installation; and (2) on numerous site visits conducted after the 1993 installation government employees observed the IDS and magazine door operation.[7]  Evidence also shows that the military conducted annual evaluations of Camp Fuji's IDS to ensure that the systems were operating properly and safely.[8]  These evaluations concluded that Marines securing the Camp Fuji magazines could accomplish their IDS procedures safely and that "the motorized door moved very slowly and the Marines...had plenty of time to arm the IDS while walking in front of the moving door."[9]  Additionally, the depositions of SSG Wilhelm and SGT Gomez (U.S. Marines charged with managing the ammunition technicians at Camp Fuji) show that the noncommissioned officers knew that Marines were walking in front of moving doors to secure the magazines, that a couple of "close calls" occurred involving these moving doors, and that one Marine had actually been trapped inside the magazine when he failed to exit the magazine before the door closed.  Furthermore, Defendants assert that the government knew and continues to be aware of the alleged dangers associated with Magazine 354's IDS because the masking/delay

---

[6]Pl.'s Ex. 21; Mazzone Dep., pp. 102-03.

[7]Defs.' Ex. 2, Mazzone Dep., p. 178; Defs.' Ex. 16, Yates Dep., p. 26; Defs.' Ex. 17, Hilton Dep., pp. 75-78.

[8]Defs.' Ex. 13, Barnes Decl. ¶ 2.

[9]*Id*. at ¶¶ 3-7.

times at Camp Fuji are still set at 60 seconds, *notwithstanding PFC McCay's accident*.  Because the record establishes that the government knew of any alleged danger associated with Magazine 354 and the associated IDS, and continued to use it without changing the time setting, the evidence meets the third *Boyle* condition.

## IV.  CONCLUSION

In summary, the court finds that the government contractor defense bars Plaintiff's products liability claim against BAE Systems and Tracor.  The Motions for Summary Judgment are, therefore, due to be **GRANTED in part** and **DENIED in part**.

Plaintiff's Motion for Partial Summary Judgment is **GRANTED in part** in that the government contractor defense does not apply to Count One's negligence claims; Count Three's Breach of warranty claims; Count Four's negligence/wantonness claims; Count Five's negligent hiring, supervision, and training claims; and Count Six's Federal Medical Care Recovery Act claim.  Plaintiff's Motion is **DENIED in part** in that the government contractor defense does apply to Count Two's product liability claim against BAE Systems and Tracor.  Defendants' Cross-Motion for Summary Judgment based on the government contractor defense is **GRANTED** as to Count Two's product liability claim against BAE Systems and Tracor, and **DENIED** as to all remaining claims.

DONE and ORDERED this 29th day of September, 2005.


KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE