FILED

2006 Aug-18  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| **NANCY McKAY, as Guardian of** | ] | |
| **ARTHUR BRUCE McKAY,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CV-03-BE-0590-W** |
| | ] | |
| **TRACOR, INC. d/b/a TRACOR** | ] | |
| **SYSTEMS TECHNOLOGIES, INC.,** | ] | |
| **a foreign corporation doing business** | ] | |
| **in the State of Alabama, et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

This case is before the court on Plaintiff's Motion for Partial Summary Judgment (doc.

47) and Defendants' Cross-Motion for Summary Judgment (Doc. 59).  For the reasons set forth

below, the court finds that both Motions are due to be **DENIED in their entirety**.

## II.  PROCEDURAL BACKGROUND

Plaintiff Nancy McKay filed this lawsuit on behalf of her son, PFC Arthur Bruce McKay,

a United States Marine who was severely injured while stationed at Camp Fuji, Japan.  She sued

Defendants BAE Systems and Keith St. John seeking monetary damages.  Plaintiff's specific

causes of action include negligence and failure to warn in Count One; products liability in Count

Two; breach of warranty in Count Three; combined and concurrent negligence and/or

wantonness in Count Four; negligent hiring, supervision, and training in Count Five; and a claim

under the Federal Medical Care Recovery Act in Count Six.

On June 2, 2004, Plaintiff filed a Partial Motion for Summary Judgment, arguing that

Defendants could not assert the government contractor defense.  *See* doc. 47.  On June 23, 2006, Defendants filed a Response in opposition to Plaintiff's Motion, and their own Cross-Motion for Summary Judgment on the government contractor defense.  *See* doc. 59.  After reviewing the submissions, the court initially found that both of these Motions were due to be granted in part and denied in part.  Specifically, the court determined that the government contractor defense barred Plaintiff's product liability claim, but that the defense was inapplicable to the remaining claims in Plaintiff's Fourth Amended Complaint.  *See* docs. 81, 82.

Thereafter, Defendants filed a Motion for Reconsideration.  *See* doc. 83.  After allowing the parties to fully brief Defendants' Motion, the court conducted a hearing on July 7, 2006.  *See* docs. 85-88.  Pursuant to that hearing, the court granted the Motion for Reconsideration, vacated its previous Order granting in part and denying in part the Motions for Summary Judgment, and ordered the parties to submit supplemental briefings on specific issues.  Accordingly, the purpose of this Memorandum Opinion and accompanying Order is to address the original Motions for Summary Judgment.[1]  *See* docs. 47, 59.

### III.  FACTS

Defendant BAE Systems consists of BAE Systems Applied Technologies, Inc.; BAE Systems North America, Inc.; BAE Systems, Inc.; and Tracor, Inc. doing business as BAE Systems Integrated Defense Solutions, Inc.  At the time relevant to this lawsuit, Defendant Keith St. John was an employee of BAE Systems who worked as an electronic technician and field supervisor for Camp Fuji, Japan.

---

[1]The court notes that the numerous submissions, the organization of those submissions, the voluminous amount of evidence, and the hearings conducted on these motions consumed court resources far in excess of what is normally required in addressing Motions for Summary Judgment.

In 1989, the United States Government awarded BAE Systems a contract to design and install a series of Intrusion Detection Systems (IDS) for the United States Marine Corps.  An IDS is an integration of sensors, software, and alarms that protects a secured area such as an armory or an ammunition magazine.  The IDS operates similar to a burglar alarm; if the IDS detects movement in or around a secured area, the system sounds an alarm and sends a signal to a command center that decides the appropriate course of action.

Under the terms of the 1989 contract, the government required BAE Systems to design and assemble an IDS for *each* work site where the IDS was installed – taking into account the site's specific needs and the physical characteristics of the secured areas.  Pursuant to that contract, in 1993, BAE Systems installed an IDS package for the ammunition magazines at Camp Fuji, Japan.

Thereafter, in 1998, the U.S. government awarded BAE Systems a service contract to maintain these same IDS for the Marine Corps.  Under the provisions of this contract, BAE Systems was required to (1) provide a field maintenance technician to maintain the IDS; (2) perform corrective, emergency, and preventive maintenance on the IDS; (3) periodically test all system parameters; and (4) schedule, conduct, and report the results of the maintenance tests.

Ordinance Magazine 354 is an ammunition magazine located at Camp Fuji.  Magazine 354 is protected by an IDS installed by BAE Systems and maintained by Keith St. John.  The magazine is also protected by a motorized steel door weighing four thousand pounds.  When the door is fully open, it takes approximately ninety seconds to completely close.

To secure Magazine 354, a Marine must call the Alarm Control Center (ACC) and request to close the magazine.  The ACC operator then places a "mask" on the IDS that disables

the alarm and allows the Marine time to enter the magazine, arm the IDS, exit the magazine, close the door, and install an intrusion device on the outside of the door.  At installation, BAE Systems set the mask time for Magazine 354 at sixty seconds, which is less than the amount of time required to close the magazine's door.  Therefore, to fully secure the magazine before the IDS activated itself and set off an alarm was impossible.

As an alternative to calling the ACC and requesting a mask, a Marine can secure Magazine 354 by turning the magazine's secure/access switch from the "access" to the "secure" position.  This switch is located inside the magazine.  Once the switch is placed in the "secure" position, the IDS arms itself after a sixty-second delay.  However, because of the ninety seconds required to close Magazine 354's door from a fully open position, the sixty-second delay time was still not sufficient to allow a Marine to place the secure/access switch to the "secure" position, exit the magazine, and close the door before the IDS activated itself and sounded an alarm.[2]

Because of the impossibility of closing a fully-opened door and securing the magazine within either the sixty-second mask time or the sixty-second delay time, the Marines at Camp Fuji utilized two methods to arm the IDS.  The first method required a Marine to partially close the magazine door using a button located outside of the magazine, and then use either the sixty-second mask time or the sixty-second delay time to complete the process.  In using the sixty-second mask time, the Marine would stop the door from closing by halting the door's movement

---

[2]The government's specifications for the IDS required that the IDS be accessed and acknowledged within a zero to five minute window.  *See* doc. 48, Ex. 7, Specification for Monitor and Control System at Marine Corps Sites, p. 18, ¶ 3.4.1.10.2.2.  Accordingly, the mask/delay time would have to be set somewhere within that window, adjusted for a small period of time whereby the actual access and acknowledgment tasks could be completed.

approximately three feet from the closed position.  Thereafter, the Marine would contact the ACC to request a mask, walk into the magazine, arm the IDS, exit the magazine, and finish closing the door within the sixty-second mask time.  In using the sixty-second delay time, the Marine would implement the previous steps but would not call the ACC to request a mask.  The second method calls for a Marine to push the button to close the magazine door, wait approximately thirty seconds, then enter the magazine, arm the IDS, and exit the structure *all while the door is closing*.  Ideally, the Marine would be able to accomplish these actions within the sixty-second default delay time built into the IDS.

On March 5, 2002 PFC Arthur Bruce McKay received orders to secure Magazine 354.  PFC McKay pushed the "close" button located outside the magazine door, walked past the moving door, armed the IDS by turning the secure/access switch to "secure," and then attempted to exit the magazine.   However, he became pinned between the four-thousand-pound door and the door frame and sustained a traumatic brain injury that will require twenty-four-hour-a-day care for the rest of his life.

## IV.  STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases where no genuine issues of material fact are present.  *See* Fed. R. Civ. P. 56.  A court must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  *Id*.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The movant can meet this burden by offering evidence showing no dispute of material fact, or by showing that the nonmoving party's evidence fails to meet some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (quoting Fed. R. Civ. P. 56(e)). The responding party does not need to present evidence in a form admissible at trial; "however, he may not merely rest on [his] pleadings." *Id*.

In reviewing the evidence submitted, "the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mutual Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). After both parties have addressed the motion for summary judgment, the court must grant the motion if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. However, the nonmovant can defeat summary judgment by showing either a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law.

The mere fact that both sides filed Motions for Summary Judgment alleging that no genuine factual issues exist does not compel the court to agree. The court must evaluate the facts to make its own determination on this point. *See United States v. Oakley*, 744 F.2d 1553, 1555

6

(11th Cir. 1984), *citing Bricklayers, Masons & Plasterers Int'l Union of America v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975).

## V. DISCUSSION

As a preliminary matter, the court notes that both parties concede that Alabama tort law applies to this case.[3]  Moreover, pursuant to this court's previous directives, this Memorandum Opinion only addresses the applicability of the government contractor defense to the Fourth Amended Complaint.[4]

### A. The government contractor defense.

The government contractor defense protects government contractors from state tort liability for equipment used by our nation's military.  *See Gray v. Lockheed Aeronautical Sys. Co.*, 125 F.3d 1371, 1377 (11th Cir. 1997), *vacated by* 524 U.S. 924 (1998), *remanded to* 155 F.3d 1343 (11th Cir. 1998).[5]  "The defense derives from the principle that where a contractor acts under the authority and direction of the United States, it shares the sovereign immunity that is enjoyed by the government."  *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir. 1989).  "Stripped to its essentials, the military contractor defense is available only when the defendant demonstrates with respect to its design and manufacturing decisions that 'the government made me do it.'"  *Gray*, 125 F.3d at 1377, *citing In re Joint Eastern & S. Dist. New*

---

[3]*See* doc. 94, p. 1, n1; transcript dated July 7, 2006, pp. 8-11.

[4]*See* doc. 29, p. 4; doc. 81, p. 2, n2.

[5]The Supreme Court vacated *Gray* on grounds unrelated to the government contractor defense, and on remand the Eleventh Circuit affirmed the remainder of the decision that did not touch the grounds on which the Supreme Court vacated.  *See Gray v. Lockheed Aeronautical Systems, Co.*, 155 F.3d 1343 (1998).  Thus, the Eleventh Circuit's analysis in *Gray* remains good law as to the government contractor defense.

*York Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990).

The United States Supreme Court addressed the government contractor defense in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988).  In *Boyle*, the plaintiff sued a government contractor on behalf of his son, a Marine aviator,  who was killed when his helicopter crashed off the coast of Virginia.  *Id*. at 502.  The Court applied the government contractor defense to the plaintiff's design defect claim, and noted that the government's procurement of military hardware qualified as an area of "uniquely federal interest."  *Id*. at 505-06.  The Court also noted that the Federal Tort Claims Act ("FTCA") demonstrated the potential for "significant conflict" between the federal interest and state law.  *Id*. at 511.  The Court stated that under the FTCA, Congress permitted suits against the United States for harm caused by the negligent or wrongful conduct of government employees, but *excepted* from consent to suit "any claim...based upon the exercise or performance or the failure to exercise or perform a *discretionary function* or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  *Id*. (emphasis added).  The Court concluded that, with respect to military equipment,

> [t]he financial burden of judgments against contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs.  To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.  In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a "significant conflict" with federal policy and must be displaced.

*Id*. at 511-12.

8

In accordance with the Supreme Court's ruling in *Boyle*, a party asserting the government contractor defense must satisfy a multi-prong inquiry.  First, the party must establish an area of uniquely federal interest.  *Id*. at 507.  Second, the party must show a significant conflict between the federal interest and state law that warrants the displacement of state law.  *Id*.  Further, the court must determine the scope of the displacement of state law by analyzing whether (1) the government approved reasonably precise specifications; (2) the equipment conformed to these specifications; and (3) the supplier warned the government about the equipment's dangers that were known to the supplier but not the government.  *Id*. at 512, *citing McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 451 (9th Cir. 1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984); *see also Glassco v. Miller Equip. Co.*, 966 F.2d 641, 642-43 (11th Cir. 1992) (establishing that the "three-part [*Boyle*] inquiry elaborates [on] the 'significant conflict' prong of the test and the scope of the displacement of state law"); *Dorse v. Eagle-Picher Industries, Inc.*, 898 F.2d 1487, 1488-89 (11th Cir. 1990).

The Eleventh Circuit has applied the government contractor defense to various scenarios. In *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311 (11th Cir. 1990), the court reversed a jury verdict for plaintiff for design defects on the basis of the government contractor defense.  *See also Gray v. Lockheed Aeronautical Sys. Co.*, 125 F.3d 1371 (11th Cir. 1997), *vacated by* 524 U.S. 924 (1998), *remanded to* 155 F.3d 1343 (11th Cir. 1998).  The court also utilized the defense to bar claims for negligent services pursuant to a maintenance contract in *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329 (11th Cir. 2003).  The Eleventh Circuit indicated that the government contractor defense *can* apply to failure to warn cases, but has yet to apply the three-part analysis regarding displacement of state law to a failure to warn claim.  *See Dorse v. Eagle-*

*Picher Industries, Inc.*, 898 F.2d 1487, 1489 (11ᵗʰ Cir. 1990) (granting the *plaintiff's* motion for summary judgment, noting that *Boyle* is not "completely meaningless" in failure to warn cases, but finding no significant conflict between the state tort duty to warn and the federal contractual duty); *Glassco v. Miller Equipment Co., Inc.*, 966 F.2d 641, (11ᵗʰ Cir. 1992) (reversing summary judgment for contractor on failure to warn claim pursuant to *Dorse*); *see also Strickland v. Royal Lubricant Co.*, 911 F. Supp. 1460, 1468 n4 (M.D. Ala. 1995) (noting "that the applicability of the *Boyle* government contractor defense in a failure-to-warn case appears uncertain.")

The basis for all of Plaintiff's claims are contracts that dictated Defendants' obligations before, during, and after the IDS was installed at Camp Fuji. These contracts include the 1989 procurement contract and the 1998 maintenance contract. Because Plaintiff's claims are based on these specific contracts, and for organizational purposes, this Memorandum Opinion analyzes the Amended Complaint pursuant to the following categories: (1) claims under the procurement contract; (2) claims under the maintenance contracts; and (3) failure to warn.[6]

### 1. Federal interest.

The first prong of the government contractor defense requires a contractor to establish a uniquely federal interest. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 507 (1988). The Supreme Court has noted that "the obligations and rights of the United States under its contracts are governed exclusively by federal law" and that "the civil liability of federal officials for actions taken in the course of their duty" is an area of "peculiarly federal concern." *Id.* at

---

[6]The failure to warn claim asserted in Count One is brought pursuant to the 1989 procurement contract and the 1998 maintenance contract. As stated at the July 7, 2006 hearing, the application of the government contractor defense to a failure to warn claim is uncertain in the Eleventh Circuit. Accordingly, this Memorandum Opinion discusses failure to warn separately from the other claims set forth in the Amended Complaint.

504-505.  The Court has further stated that areas of uniquely federal interest include the

procurement and maintenance of military hardware.  *See Id*. at 505 (procurement); *Hudgens*, 328

F.3d at 1334 (maintenance).

This case centers on a series of procurement and service contracts that relate to the IDS

installed on Magazine 354 at Camp Fuji, Japan.  None of the parties challenge the fact that the

procurement and servicing of the IDS are areas of uniquely federal interest.  Pursuant to the

holdings in *Boyle* and *Hudgens*, uniquely federal interests are at issue in this case.  Accordingly,

the first prong of the government contractor defense is satisfied.

### 2.  Conflict between the federal interest and state law warranting displacement of state law.

Under the second prong of the government contractor defense, a contractor must establish

a significant conflict between a uniquely federal interest and the operation of state law that

warrants displacement of the state law.  *See Boyle*, 487 U.S. at 507.  To limit the contours of

what constitutes a "significant conflict," the Supreme Court has relied on the discretionary

function exception in the FTCA.  *Id*. at 511.  As stated previously, the FTCA authorizes suit

against the United States for the negligent or wrongful conduct of its employees, but it excepts

from suit

> [a]ny claim...based upon the exercise or performance or the failure to exercise or
> perform a *discretionary function* or duty on the part of a federal agency or an
> employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(b) (exceptions to the FTCA) (emphasis added).  Consequently, to satisfy the

second *Boyle* prong and establish a significant conflict between the federal interest and state law,

the court must ask whether the government exercised its discretion over Defendants'

11

performance under the contracts at issue.  *See Boyle*, 487 U.S. at 511-12 ("the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function"); *Hudgens*, 328 F.3d at 1334 (the "formulation of design specifications and the articulation of maintenance protocols" are discretionary functions); *Glassco v. Miller Equip. Co.,* 966 F.2d 641, 643 (11th Cir. 1992) (noting that the government's "discretionary decision" was protected by the government contractor defense); *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1317 (11th Cir. 1989) ("in determining whether a claimed defect is one of 'design' for purposes of the government contractor defense, the proper focus is the protection of discretionary government functions"); *Strickland v. Royal Lubricant Co.,* 911 F. Supp. 1460, 1465 (M.D. Ala. 1995) (stating that the government contractor defense is a by-product of the discretionary function exception to the FTCA which "protects the United States from liability for its agents' performance of duties involving discretionary decisions.")

In other words, the operative inquiry in this case is "who exercised discretion" under the procurement and maintenance contracts.  If the government exercised discretion, then Defendants are likely protected by the government contractor defense.  If Defendants exercised their own discretion, then their conduct is subject to state tort liability.  Put more simply, did the government make Defendants set or leave the mask/delay time setting at sixty seconds?  *See Gray*, 125 F.3d at 1377 ("[s]tripped to its essentials, the military contractor defense is available only when the defendant demonstrates with respect to its design and manufacturing decisions that 'the government made me do it.'").

### a.  The procurement contract.

The 1989 procurement contract required Defendants to design and assemble an IDS for

each work site where the IDS was installed, taking into account the site's specific physical characteristics.  Pursuant to this contract, Plaintiff alleges that Defendants improperly designed and installed Magazine 354's IDS because the specific design feature in question – the mask/delay time – was set at sixty seconds, and 354's door took at least ninety seconds to close.  Plaintiff contends that, because the government's IDS specifications permitted the mask/delay time to be set *somewhere* within a zero second to five minute window, the Defendants exercised *complete* discretion when it pre-set Magazine 354's mask/delay time at sixty seconds.[7]  To support her argument, Plaintiff offers the original Statement of Work and various witnesses' deposition testimony to show that BAE was required to tailor the mask/delay time to *each site* – taking into account that site's particular characteristics such as the type of door, weight of door, etc.  Because Magazine 354's doors took longer to close than the pre-set sixty-second setting would allow, Plaintiff contends that Defendants improperly failed to design and install the IDS pursuant to Magazine 354's specific characteristics.  Plaintiff concludes that the decision to leave the time setting at sixty seconds was a discretionary act by Defendants – not a government mandate – thereby foreclosing the use of the government contractor defense on Plaintiff's claims.

In response, Defendants argue that the *government* exercised its judgment and discretion over the features of Magazine 354's IDS.  Defendants offer various formal military acceptance

---

[7]Mark Brown was the SPAWAR branch head for the IDS program.  SPAWAR is the acronym for the Space and Naval Warfare System Center, a division of the U.S. government that oversaw the contract operations.  Mr. Brown co-wrote the initial Statement of Work containing Defendants' contractual obligations under the 1989 contract.  He testified that the purpose of the Statement of Work was to "identify the generic requirements to support requirements of the contract, [and] to provide direction, *not total instruction* to a contractor..."  *See* doc. 48, Ex. 28, Brown Dep., p. 21 (emphasis added).  Plaintiff offers this testimony as additional evidence that Defendants exercised discretion in the installation and design of Magazine 354's IDS.

documents, called DD Form 250s, as evidence that the government *tested and accepted* Magazine 354's IDS in its sixty-second configuration.  They also offer the testimony of Vanette Cowart, one of the SPAWAR employees that conducted the final acceptance test of the IDS in January, 1993.  Ms. Cowart testified that the SPAWAR installation team tested Magazine 354's IDS during its installation, noted the sixty-second time setting, and accepted the system with its sixty-second setting.[8]

Further, Defendants argue that the government's participation during the installation of the IDS, coupled with its use of the sixty-second mode for at least ten years after installation, shows that the government was involved in the decision to leave the IDS at the default setting. *See Gray*, 125 F.3d at 1378 ("[a] contractor may show conformity through evidence that the military was present, and actively involved throughout the design, review, development and testing of the equipment at issue"); *In re Air Disaster v. Lockheed Corp.*, 81 F.3d 570, 575 (5th Cir. 1996) (holding that the use of an Air Force aircraft for over twenty years coupled with the fact that Air Force personnel were involved in the design and testing of the aircraft sufficed to show conformance).  Essentially, Defendants contend that the military's long-term use and acceptance of the sixty-second mask/delay time shows that the government exercised its discretion and approved of this setting.

With respect to the long-term use of Magazine 354's sixty-second setting, the Fifth Circuit's opinion in *Trevino v. General Dynamics Corp.*, 865 F.2d 1474 (5th Cir. 1989) is

---

[8]*See* Doc. 62, Ex. 15, Cowart Dep., pp. 31-34; Ex. 24, Cowart Decl., ¶ 7 ("each IDS on each magazine, including magazine 354, functioned as intended by [SPAWAR]....Our tests showed, among other things, that Marines could enter the magazines, including magazine 354, turn the secure/access switch to "secure" in order to arm the IDS, exit the magazines, and secure the magazines without setting off alarms.")

instructive.  In *Trevino*, five Navy divers were killed in a submarine when the "control bubble" in their diving chamber malfunctioned.  *Trevino*, 865 F.2d at 1476.  The families of the divers sued General Dynamics, claiming that the control bubble was defective.  *Id*.  The court noted that (1) the Navy delegated the design of the product to General Dynamics; (2) the Navy accepted the product without performing or requiring a formal design/safety review; and (3) the Navy operated the product for thirteen years without incident.  *Id*. at 1476-77.  However, the court found that the government contractor defense did not apply in that case, in part because General Dynamics exercised its own discretion over the design of the product.  The court stated that

> *[i]f the government delegates* its design discretion to the contractor and allows the contractor to develop the design, the government contractor *defense does not apply*.  If the government has so delegated its discretion to the contractor, *mere government acceptance of the contractor's work does not resuscitate the defense **unless** there is approval based on **substantive** review and evaluation of the contractor's design choices*.  A mere rubber stamp by a federal procurement officer does not constitute approval and does not give rise to the government contractor defense.

*Id*. at 1486 (emphasis added).

The record shows that the Marines utilized Magazine 354's IDS in the sixty-second setting for several years after it was installed.  However, the evidence is conflicting as to whether the government delegated the task of setting the mask/delay time to Defendants.  Additionally, the record is unclear as to whether the annual acceptance of Defendants' work pursuant to the maintenance contract constituted a substantive review of the mask/delay time setting.  The key issue remains whether Defendants exercised discretion in setting Magazine 354's IDS at sixty seconds.  Pursuant to *Trevino* and the evidence in this case, whether the government or Defendants exercised discretion over the acceptance and use of the sixty-second mask/delay time

is a jury question.  An issue of material fact exists here because both parties present admissible evidence to show that *either* (1) Defendants exercised complete discretion in setting the mask/delay time at installation; *or* (2) the government exercised discretion by accepting the IDS as it was installed.

Accordingly, because a disputed issue of fact exists as to who exercised discretion in designing and installing Magazine 354's IDS, both Motions for Summary Judgment on the claims related to the 1989 procurement contract must be denied.  The court thus need not apply the remaining *Boyle* factors to these claims.

## b. The maintenance contract.[9]

After Magazine 354's IDS was installed, the government awarded BAE Systems a contract to perform maintenance on the IDS.  Under the provisions of this contract, BAE Systems was required to:

- Provide a field maintenance technician to maintain the IDS.
- Periodically test the IDS and perform corrective, emergency, and preventive maintenance on the system.
- Periodically test all "system parameters to verify programmed functions...."
- Schedule, conduct, and report the results of the maintenance tests.

Plaintiff argues that Defendants improperly performed the service contract obligations; namely, that Defendants (1) did not report to SPAWAR the mask/delay time problems associated with Magazine 354, and (2) did not change the IDS' parameters to a setting that would permit Marines to safely arm the IDS.  More specifically, Plaintiff contends that Defendants acted with complete discretion when performing the IDS maintenance.  In support of this contention,

---

[9]The court recognizes that the government contractor defense can be applied to service contracts.  *See Hudgens v. Bell Helicopter/Textron*, 328 F.3d 1329, 1334-35 (11th Cir. 2003).

16

Plaintiff offers the following:

- BAE Systems' on-site field maintenance technician at Camp Fuji was Keith St. John.
- Marine Corps Staff Sergeant Andrew Wilhelm informed St. John of a problem with 354's IDS.  SSG Wilhelm was the staff non-commissioned officer in charge of Camp Fuji's Ammunition Supply Point.  SSG Wilhelm informed St. John that the sixty-second mask time required Marines to move in front of the magazine's moving doors, that one Marine had already been trapped in the magazine, and that there were other "close calls."  SSG Wilhelm asked St. John if the mask/delay time parameters could be extended.  St. John told SSG Wilhelm that the mask/delay time parameters could not be extended "because it was too technically difficult."
- St. John did not report any problems with the mask/delay time to SPAWAR or BAE Systems.
- St. John had the requisite computer clearance and expertise to change the mask/delay time.  According to SPAWAR, the marines at Camp Fuji did not.
- St. John could make a unilateral change to the mask/delay time without prior SPAWAR approval.

Based on this evidence, Plaintiff argues that Defendants (1) had a contractual obligation to test and maintain the IDS; (2) were notified of a problem with the mask/delay time; (3) had the ability and obligation to fix the problem; and (4) exercised their discretion not to change the time parameters.  Accordingly, Plaintiff contends that Defendants acted with complete discretion in maintaining Magazine 354's IDS, and that the government contractor defense does not apply.

In contrast, Defendants contend that (1) they complied with the requirements of the maintenance contracts; (2) they were not permitted to unilaterally change the IDS time setting; and (3) the military – with full knowledge of the possible dangers associated with the IDS – affirmatively and deliberately chose to maintain the sixty-second setting.  As such, Defendants argue that the government exercised discretion in maintaining the IDS' time parameters, and they, as contractors, are protected by the government contractor defense.  To support this

argument, Defendants offer the following:

- The U.S. government issued DD Form 250's that demonstrate that Defendants complied with their obligations under the maintenance contracts until March 12, 2003.
- SPAWAR employees verified that the Defendants complied with their contractual obligations under the maintenance contracts.
- The SPAWAR personnel who signed and issued the DD Form 250s did so after consulting with the government personnel who reviewed whether Defendants' work conformed to contract requirements.
- Once the IDS was installed on Magazine 354, neither SPAWAR nor Defendants were responsible for the Marines' standard operating procedures regarding how to secure the magazine.
- If Camp Fuji decided to use a procedure that included a sixty-second delay/mask time and allowed Marines to walk in front of a moving door, that decision was within the Marines' discretion.
- During installation, SPAWAR tested the IDS and determined that it fulfilled the government's requirements.
- Even though St. John was physically capable of changing the mask/delay time, he was not to permitted to make such a change unless a physical security marine completed and submitted the appropriate "trouble ticket."

Based on Defendants' submissions, a fact finder could conclude that the government effectively proscribed the use of the sixty-second setting by affirmatively accepting it at installation, and during annual inspections conducted after installation.  However, based on Plaintiff's submissions, a fact finder could conclude Defendants exercised their own discretion in leaving the mask/delay time setting at sixty seconds even though Defendants knew that this did not give Magazine 354's door time to fully close.  Accordingly, evidence on the record could support a finding either (1) that Defendants exercised discretion under the service contracts by knowingly leaving the IDS mask/delay time at sixty seconds, or (2) that the government exercised discretion by affirmatively accepting the sixty-second setting.  Thus, a disputed issue of fact exists as to the conflict between the federal interest and state law.  Accordingly, both Motions for Summary Judgment must be denied on the claims associated with the maintenance

contract.

### c. Failure to warn.

Plaintiff also alleges a claim for failure to warn of the dangers associated with the IDS.

Whether the government contractor defense applies to failure to warn claims in the Eleventh

Circuit is uncertain.  The Eleventh Circuit addressed this issue in *Dorse v. Eagle-Picher*

*Industries*, where the plaintiff sued for injuries related to asbestos exposure.  The court stated that

it

> agrees with the defendant that *Boyle* is not strictly limited to design defect cases.
> The government contractor defense, for example, could arise when the
> government prohibits a specific warning.  On the other hand, the court agrees with
> the plaintiff that the three-part test of *McKay* [*v. Rockwell Int'l Corp.*, 704 F.2d
> 444, 451 (9th Cir. 1983), cert denied, 464 U.S. 1043 (1984)] is necessarily limited
> to design defect cases.  The *Boyle* decision, however, is not rendered completely
> meaningless in "failure to warn" cases.
>
> To resolve the dilemma of applying *Boyle* to a "failure to warn" case, *Boyle's*
> two-pronged analysis guides the court.

*Dorse v. Eagle-Picher Industries, Inc.*, 898 F.2d 1487, 1489 (11th Cir. 1990).[10]  Pursuant to this

analysis, the court first asked whether the case involved an area of uniquely federal interest.  *Id*.

---

[10]In contrast, other circuits have specifically modified the *Boyle* test to apply to failure to
warn claims.  *See, e.g., Densberger v. United Technologies Corp.*, 297 F.3d 66, 75 n.11 (2d Cir.
2002) ("[t]he three requirements of the *Boyle* test for failure to warn cases are: (1) government
control over the nature of products warnings; (2) compliance with the Government's directions;
and (3) communication to the Government of all product dangers known to it but not to the
Government") (internal quotations omitted); *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431,
438 (5th Cir. 2000) ("[s]tate law is displaced if (1) the United States exercised discretion and
approved the warnings; (2) the contractor provided a warning that conformed to the approved
warnings; and (3) contractor warned about the dangers it knew, but the government did not");
*Tate v. Boeing Helicopters*, 140 F.3d 654, 656-57 (6th Cir. 1998) (state law is displaced when the
contractor shows: "(1) the United States exercised its discretion and approved the warnings, if
any; (2) the contractors provided warnings that conformed to the approved warnings; and (3) the
contractor warned the United States of the dangers in the equipment's use about which the
contractor knew, but the United States did not.")

Concluding that it did, the court next examined whether a significant conflict existed between the state tort duty to warn and the federal contractual duty to provide cement containing asbestos.  *Id*. The court determined that no conflict existed, and that the defendant could have complied with both its contractual and state tort duties.  *Id*. at 1489-90.  Consequently, the Eleventh Circuit held that the government contractor defense did not bar the plaintiff's failure to warn claims.  *See also Strickland v. Royal Lubricant Co., Inc.*, 911 F. Supp. 1460, 1468, n4 (M.D. Ala. 1995) (noting that the defendants did not raise the government contractor defense against the failure to warn claims, and observing that "the applicability of the *Boyle* government contractor defense in a failure-to-warn case appears uncertain"); *Hudgens v. Bell*, Case No. 99-2042, Doc. 45, Memorandum Opinion dated Sept. 28, 2001, p. 12, n7 (unpublished) ("[t]he court notes that the applicability of the *Boyle* government contractor defense in a failure-to-warn case is uncertain.").

Plaintiff argues that nothing in the applicable contracts prevented Defendants from issuing warnings about the mask/delay time to either the Marines using the IDS or SPAWAR. Moreover, Plaintiff points to the testimony of SPAWAR project manager Frank Mazzone, who expressly stated that he did not prevent BAE from issuing warnings about the nature of the door closing.  Consequently, Plaintiff contends that the Eleventh Circuit's holding in *Dorse* controls this case and the government contractor defense is inapplicable to the failure to warn claim.

In contrast, Defendants state that failure to warn claims are typically addressed under the third element of *Boyle*.  Defendants argue that, because the government already knew of any alleged danger, the failure to warn claim is due to be dismissed under the government contractor defense.  Defendants cite to various DD Form 250's signed pursuant to the maintenance contract, as well as the evidence noted previously in this memorandum, as factual support for this

argument.  Defendants further cite *Harduvel v. General Dynamic Corp.*, 878 F.2d 1311 (11th Cir. 1989) as legal authority to support their contention.

The court finds that, under either *Boyle*, *Dorse*, or *Harduvel*, a disputed issue of fact exists as to which party exercised discretion in failing to warn about the dangers associated with Magazine 354's IDS.  Similar to the court's findings as to the procurement contract and the maintenance contract, which party exercised discretion is a question for a jury.  Consequently, both Motions are denied as to the failure to warn claim.

## VI.  CONCLUSION

The court recognizes the importance of applying the government contractor defense early in the litigation.  However, the evidence on record makes this determination impossible when genuine issues of material fact are present.  The purpose of the government contractor defense is not to protect contractors; rather, it is to protect the government from litigation costs that contractors will ultimately pass on to the government.  A prerequisite for the application of this defense is for the contractor to address the issue of discretion, and to show that "the government made me do it."  *Gray*, 125 F.3d at 1377.  In this case, disputed issues of fact exist as to whether the government or Defendants exercised discretion over Defendants' actions as they relate to the procurement contract and the maintenance contract for the IDS at Camp Fuji.  Accordingly, the application of the government contractor defense is an issue that should be presented to a jury.

The court finds that both sides' Motions for Summary Judgment (docs. 47 and 59) are due to be **DENIED**.  A separate Order to this effect will be entered contemporaneously with this Memorandum Opinion.

DONE and ORDERED this 18th day of August, 2006.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE